1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF COLORADO

3
     Civil Action No. 18-cv-02472-DDD-MEH
4

5      RESTORE LIFE USA, INC.,                    Volume III of III
       and JAMES BYRD,                            (Pages 272 - 323)
6
               Plaintiffs,
7
               vs.
8
       LIFENEWS.COM, and STEVEN ERTELT,
9
               Defendants.
10
     ----------------------------------------------------------------
11
                         REPORTER'S TRANSCRIPT
12                           JURY TRIAL

13   ----------------------------------------------------------------

14            Proceedings before the HONORABLE DANIEL D. DOMENICO,
     Judge, United States District Court for the District of
15   Colorado, and a jury of seven, commencing at 9:40 a.m. on the
     9th day of June, 2022, in Courtroom A1002, Alfred A. Arraj
16   United States Courthouse, Denver, Colorado.

17
                               APPEARANCES
18
     For the Plaintiffs:
19   RICHARD ANDREW HUTCHINSON, BAKER, DONELSON, BEARMAN,
     CALDWELL & BERKOWITZ, P.C., 602 Sevier Street, Suite 300,
20   Johnson City, TN 37604

21   For the Defendants:
     SAMUEL MARTIN VENTOLA, VENTOLA LAW OFFICE, 1775 Sherman
22   Street, Suite 1650, Denver, CO 80203

23

24
          JULIE H. THOMAS, RMR, CRR, Official Court Reporter,
25    901 19th Street, Room A256, Denver, CO 80294, (303)335-2111

            Proceedings reported by mechanical stenography;
               transcription produced via computer.

 1                          I N D E X

 2
     JURY INSTRUCTIONS                                        PAGE

 3
     Instruction Conference                                   274

 4


 5
     CLOSING ARGUMENTS                                        PAGE

 6
     Mr. Hutchinson                                           287
 7   Mr. Ventola                                              298
     Mr. Hutchinson                                           313

 8


 9
     JURY VERDICT                                             PAGE

10
     Reading of Verdict                                       319

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1         (Proceedings resumed 9:40 a.m., June 9, 2022,

 2     outside the presence of the jury.)

 3         THE COURT:  So we are here to have our charge

 4  conference in 18-cv-2472.  So counsel was provided a while ago

 5  with our draft copy of the instructions.  We made a few tweaks

 6  on our own, got a few suggested changes from counsel, then

 7  this morning provided counsel with our proposed final changes

 8  that incorporate some suggestions but not all.

 9         I think what I'd like to do is just begin by noting

10  that I think the only changes that anyone suggested to what we

11  sent out a week or a couple weeks ago were to what is now

12  Instruction No. 9, Instruction No. 11, 12, 13, 14, and 19.  I

13  know there was a suggested change also to number 10 that I do

14  not want to accept.  But other than those instructions, did

15  anybody -- is everybody okay with our proposed final

16  instructions?  We can discuss those ones that we did make

17  changes to or we do propose making changes to, but I just want

18  to make sure there's no suggestions on those or the verdict

19  form, for that matter, which we did clean up a couple of

20  typos.

21         Mr. Hutchinson, anything on any of the other

22  instructions?

23         MR. HUTCHINSON:  No, Your Honor.

24         THE COURT:  Mr. Ventola, other than the ones I just

25  mentioned, any?

 1          MR. VENTOLA:  I don't know that you mentioned all of

 2   them, Your Honor.  First of all, I mean, I think I made a good

 3   record on this in the motion for directed verdict, but, I

 4   mean, we object to any instruction regarding any claim by

 5   Mr. Byrd because there was never any statement regarding him.

 6          THE COURT:  Understood.

 7          MR. VENTOLA:  In terms of these instructions, Your

 8   Honor, I think you did mention number 10.  We added one after

 9   10, regulation of fetal tissue, and I have some objections to

10   the changes that the Court made to our suggested --

11          THE COURT:  Well, let me just ask you:  Besides those

12   ones, any of the others, for example, 1 through 8, any of the

13   ones that I didn't mention, is there anything we need to

14   discuss?

15          MR. VENTOLA:  I thought there were some that you

16   didn't mention, Your Honor.  We don't have any objection to 1

17   through 8 or 9 to what you have --

18          THE COURT:  Okay.

19          MR. VENTOLA:  -- now.  We had an additional sentence

20   in 10 that was eliminated.  We object to the elimination of

21   that sentence.

22          THE COURT:  Okay.  And I understand where that comes

23   from, but these are from the Tennessee pattern instructions,

24   so I think I'm satisfied.

25          MR. VENTOLA:  I understand, Your Honor.  I'm just

1    preserving the objection.

2              THE COURT:  Fair enough.

3              MR. VENTOLA:  Then we object to what's currently

4    number 10.  And I state my fault in this.  I don't think I

5    renumbered the instructions, but the instruction regarding

6    regulation of fetal tissue, we object to what the Court

7    currently has.

8              THE COURT:  Why don't we go ahead and discuss that

9    one, because I appreciated your -- I was considering whether

10   we needed to discuss the legal definition, given how much

11   testimony there was about that and the fact that the jury was

12   shown the statute.  So I did appreciate, ultimately, your

13   suggestion that we include some explanation of that.

14             Obviously, I added some additional language because

15   I'm concerned that, particularly if we include an instruction

16   on it, that it would be confusing to the jury that they would

17   have to find -- make that legal determination.  We can clarify

18   for them that they can consider the legal definitions, but I

19   think it's important, especially if we include another

20   explanation of the legal provision, that we clarify for them

21   that it's not part of the elements in this case, at least,

22   that they find that one way or another.  I do think it's

23   relevant, as the instruction says.  But why don't you go ahead

24   and make your --

25             MR. VENTOLA:  So we do object to the admission of the

 1   requirement that it affect interstate commerce.  That is in

 2   the statute, and it is required in order for it to become

 3   illegal.  And we object to the -- in terms of the second

 4   paragraph, Your Honor, I suppose the first two or first

 5   several sentences are okay, but I disagree with the part

 6   beginning with the sentence:  *But whether the acts described*

 7   *in the articles are illegal is not an essential element of a*

 8   *defamation claim.*  I disagree with that.  I think it would

 9   have to be illegal for there to be a defamation claim.  So I

10   object to that portion of the instruction and the rest

11   following.

12           THE COURT:  Okay.  Mr. Hutchinson, go ahead.

13           MR. HUTCHINSON:  Your Honor, this was resolved

14   essentially in defendant's favor on requesting that Tennessee

15   law rule the day here.  Therefore, there's not defamation

16   per se.  That's not the rule.  It's not what we're going by.

17   So we certainly don't have to prove that he violated that act

18   to meet the elements of defamation.  So I think that sentence

19   is entirely appropriate.

20           THE COURT:  Yeah, I agree.  I don't -- there's plenty

21   of ways someone can be defamed without it violating -- without

22   being accused of violating the law.  So you have made your

23   objection, but I think it's an accurate statement.

24           MR. VENTOLA:  I understand, Your Honor.  And we

25   talked about this yesterday in terms of directed verdict --

1          THE COURT:  But --

2          MR. VENTOLA:  -- but it's still our position that in

3    terms of business context, really there's no way that they can

4    be subject to the high standard of Tennessee law as to what's

5    defamatory without it being illegal.

6          In terms of Instruction No. 11, Your Honor --

7          THE COURT:  Hold on one second, because I think I did

8    agree with you on the first part of your objection.  I'm

9    willing to put back in the "affects interstate commerce"

10   clause or phrase into the first part of whatever

11   instruction -- I think it's Instruction 11 now.

12         MR. VENTOLA:  Thank you, Your Honor.

13         THE COURT:  I am willing to do that.

14         Mr. Hutchinson?

15         MR. HUTCHINSON:  It's in the statute.

16         THE COURT:  Yeah, okay.

17         MR. VENTOLA:  In terms of Instruction 11, Your Honor,

18   my concern is, although previous Supreme Court cases have used

19   terms to describe the standard for actual malice, we don't

20   include them because it's confusing.  They have common meaning

21   to people, and Your Honor has chosen to exclude the words

22   "actual malice."  It's an actual malice standard, but you

23   don't want to include the words "actual malice" because you

24   think that's going to confuse the jury into thinking something

25   about the common understanding of those words.  And I

1    understand that, but I have the same problem with "reckless

2    disregard."  That sounds like sloppiness.  That sounds like

3    should have seen it but didn't.  So when you use the words

4    "reckless disregard," I think you mislead the jury.  When the

5    Supreme Court has defined -- although it first in *New York*

6    *Times versus Sullivan* used the word "reckless disregard,"

7    cases since then have defined it to mean it's not just

8    recklessness, it's actual knowledge of falsity or, uh -- let

9    me see if I can see it --

10            THE COURT:  Well, so I totally understand what you

11   are saying.  "Reckless disregard" is a difficult to define

12   standard, and I think what we have now as Instruction 14, I

13   think the best we can do is use that standard and then define

14   it, because I do think it's to some extent better than "actual

15   malice."  I am willing and in my current version we included

16   that extra clause that you pointed out regarding "or the

17   defendants entertained serious doubt as to the truth."  So I

18   think that's the best we can do, but you can preserve your

19   objection if you'd like.

20            MR. VENTOLA:  So I would argue that the words

21   "reckless disregard," for the same reason you don't use the

22   words "actual malice," should not be used because they mislead

23   the jury.  And so it should be defined in terms of what you

24   have, which is high degree of awareness that the published

25   statements were probably false.

 1          THE COURT:  Yeah, so I think having a separate

 2    definition is -- I understand the objection, but I'll overrule

 3    it, and I think that we're better off using it and then

 4    defining it, because it is fairly complicated.

 5          MR. VENTOLA:  So in terms of Instruction 13, Your

 6    Honor, I think if you are going to include the words "reckless

 7    disregard," you should probably pare it down to take out the

 8    language that I had, which was "entertain serious doubts," and

 9    just go with -- because I'm just trying to shorten this down

10    to get it to be clear as possible -- what you originally had,

11    "defendants had a high degree of awareness that the published

12    statements were probably false."

13          THE COURT:  Well, so that was taken from -- I forget

14    what that case was, but I do think that's the definition, so

15    I'm going to leave that there.  I do appreciate that, though.

16          MR. VENTOLA:  And, again, we object to the inclusion

17    of "acted recklessly" at the end of the instruction for the

18    reason we stated.

19          THE COURT:  Understood.  Okay.  Anything else?

20          MR. VENTOLA:  Your Honor, we object to the

21    instruction on punitive damages for the reasons I already

22    discussed.

23          THE COURT:  Okay.  Understood, and overruled.

24          MR. VENTOLA:  That's all I have, Your Honor.  So I

25    would tender the instructions we provided to the Court and the

1   ones that I addressed.

2           THE COURT:  Okay.  So I will overrule those

3   objections except to the extent I have incorporated some of

4   your proposed language.

5           My understanding, then, is the only change to what we

6   brought out this morning is to add back in "affects interstate

7   commerce" into the first part of that, the sort of legal

8   definition.  Is that consistent with your understanding,

9   Mr. Hutchinson?

10          MR. HUTCHINSON:  Yes, Your Honor.

11          THE COURT:  Mr. Ventola, is that your understanding?

12          MR. VENTOLA:  I think so, Your Honor, yeah.

13          THE COURT:  Okay.  So here's what I'd like to do.

14  Mr. Weisberg has been keeping charge of the final version.  I

15  will have him make that change, bring out paper copies to each

16  of you, give you a few minutes to review it.  If you catch

17  something that we've gotten wrong, let us know.  Otherwise, if

18  nobody catches anything, I will come out and prepare to give

19  instructions to the -- give those instructions to the jury.

20          I will just say the instructions include, sort of as

21  a last instruction before closing arguments, that closing

22  arguments are -- again reminding the jury closing arguments

23  are not evidence, that only the witnesses can provide

24  evidence.  And I will also, if necessary, remind them of that

25  again after closing arguments.  And the reason I do that is

 1   because I just -- I personally dislike objections during

 2   closing arguments, and especially bad objections, and so I'm

 3   trying to head that off.  Obviously, you have an obligation if

 4   something is really objectionable to object, but my hope is we

 5   won't make that sort of objection because I will remind the

 6   jurors of it before and afterwards probably.  And, of course,

 7   counsel has an obligation not to intentionally misstate or

 8   mislead anything in their closing arguments.

 9        So I just remind you that they have been instructed

10   on that I think at least four times already.  They will be

11   instructed on that at least once or twice.  And my experience

12   in talking to juries is they don't tend to like interruptions

13   during these things.  So that's my request, that you not make

14   that sort of objection unless it's truly, truly necessary,

15   because they will be reminded, and I will most likely overrule

16   the objection on that basis and just move on.  But, of course,

17   that's up to you.

18        So we will print out copies of the true final

19   instructions, give you one last -- and the verdict form, give

20   you one last chance to look those over.  If nobody has caught

21   anything, we will try to begin at 10:00, hoping that our

22   technology issue is resolved by then.

23        Can I get the parties to waive the court reporter

24   actually typing in the instructions as I read them, and we'll

25   just use the instructions themselves?

Julie H. Thomas, RMR, CRR                          (303)335-2111

```
 1              MR. HUTCHINSON:  Yes, Your Honor.

 2              MR. VENTOLA:  No objection, Your Honor.

 3              THE COURT:  All right.  Okay.  Thank you very much.

 4   Anything else?

 5              All right.  Thank you all.  We'll be back shortly.

 6         (Proceedings recessed 9:50 a.m. to 10:22 a.m.,

 7           resuming outside the presence of the jury.)

 8              THE COURT:  Good morning.  Take your seats, please.

 9              All right.  Counsel, I understand we are all

10   comfortable with the current set of instructions,

11   understanding the objections that have previously been made.

12              After I instruct the jury, as I think I mentioned,

13   each of you will have 30 minutes for closing.  Plaintiff will

14   go first, can reserve time, but it will sort of be up to you

15   to keep track of your own time.  Each side will have 30

16   minutes total for closings, and then we will get the case to

17   the jury.

18              Anything else before we bring them in?

19              MR. HUTCHINSON:  No, Your Honor.

20              MR. VENTOLA:  No, Your Honor.

21              THE COURT:  All right.  Mr. Keech, shall we bring the

22   jury in?

23              COURTROOM DEPUTY:  Yes, Your Honor.

24         (Jury in at 10:25 a.m.)

25              THE COURT:  All right.  Let's all take our seats.
```

1          Welcome back, members of the jury.  Thank you again

2     for your patience and your diligence in this case.  The next

3     step in this process is I will now read you your final

4     instructions.  You have also been given a copy of these

5     instructions, and you can follow along if you wish.  You may

6     take notes on your copy.  The original set of instructions

7     will be given to you in the jury deliberation room, along with

8     the official verdict form.  If there are any discrepancies

9     between the original version and your copy, it is the original

10    version of the instructions or your recollection of what I

11    instruct you orally that are binding on you, not your copies.

12         Okay.  After I read you your instructions, counsel

13    will give their closing arguments, and then you will retire to

14    deliberate and reach a verdict.  Okay.

15        (Jury instructions read by the Court; not

16         reported.)

17         THE COURT:  Those are your instructions.  I will now

18    read the verdict form that you will receive.

19         Verdict Form.

20         Defamation - Restore Life USA, Inc.

21         Question 1.  Did Restore Life USA, Inc., prove the

22    elements of its defamation claim against LifeNews.com and

23    Steven Ertelt as described in Instruction No. 12?  Blank for

24    Yes or No.

25         If your answer to Question 1 is Yes, then proceed to

1    answer Questions 2 through 3 under the heading Damages -

2    Restore Life USA, Inc., on the next page.

3           If your answer to Question 1 is No, then skip

4    Questions 2 and 3 and proceed to Question 4 under the heading

5    Defamation - James Byrd on page 4.

6           Damages - Restore Life USA, Inc.  Answer Questions 2

7    and 3 only if you answered Yes to Question 1.

8           Question 2.  Based on Instruction No. 16, state the

9    amount of compensatory damages you find will fairly and

10   adequately compensate Restore Life USA, Inc., for the injury

11   cause by LifeNews.com's and Steven Ertelt's defamation.  And a

12   blank for the dollar amount.

13          Question 3(a).  Based on Instruction No. 17, do you

14   find that LifeNews.com and Steven Ertelt are guilty of actual

15   malice or wanton, reckless, or willful misconduct toward

16   Restore Life USA, Inc.?  Check Yes or No.

17          If your answer to Question 3(a) is Yes, then answer

18   Question 3(b).

19          And if your answer to Question 3(a) is No, then skip

20   Question 3(b) and proceed to Question 4 on the next page.

21          (b).  State the amount of punitive damages, if any,

22   you award to Restore Life USA, Inc., for the purpose of

23   punishing LifeNews.com and Steven Ertelt for their defamation

24   and serving as an example to others.  A blank for the dollar

25   amount.

Julie H. Thomas, RMR, CRR                                (303)335-2111

 1          Proceed to Question 4 on the next page.

 2          Defamation - James Byrd.

 3          Question 4.  Did James Byrd prove the elements of his

 4   defamation claim against LifeNews.com and Steven Ertelt as

 5   described in Instruction No. 12?  And blank for Yes or No.

 6          If your answer to Question 4 is Yes, then proceed to

 7   answer Questions 5 and 6 under the heading Damages - James

 8   Byrd on the next page.

 9          If your answer to Question 4 is No, then skip

10   Questions 5 and 6 and proceed to sign and date the verdict

11   form on the last page.

12          Damages - James Byrd.  Answer Questions 5 and 6 only

13   if you answered Yes to Question 4.

14          Question 5.  Based on Instruction No. 16, state the

15   amount of compensatory damages you find will fairly and

16   adequately compensate James Byrd for the injury caused by

17   LifeNews.com's and Steven Ertelt's defamation.  And a blank

18   for the dollar amount.

19          Question 6.  Based on Instruction No. 17, do you find

20   that LifeNews.com and Steven Ertelt are guilty of actual

21   malice or wanton, reckless, or willful misconduct towards

22   James Byrd?  And a blank for Yes or No.

23          If your answer to Question 6(a) is Yes, then answer

24   Question 6(b).  If your answer to Question 6(a) is No, then

25   skip Question 6(b) and proceed to sign and date the verdict

1    form on the last page.

2              (b).  State the amount of punitive damages, if any,

3    you award James Byrd for the purpose of punishing LifeNews.com

4    and Steven Ertelt for their defamation and serving as an

5    example to others.  And a blank for a dollar amount.

6              Proceed to sign and date the verdict form on the last

7    page.  The last page is marked Signature, it has a line for

8    the foreperson to sign and date the verdict form.

9              So I will be providing these to Mr. Keech, who will

10   mark them as the original.  He will then provide them to you

11   for your deliberations.

12             As I noted, the next step is to hear closing

13   arguments from counsel.  We'll begin with plaintiff, then the

14   defendant.  Plaintiff may, if he chooses, reserve a few

15   minutes for rebuttal at the end.

16             I remind you that these arguments are not evidence in

17   the case and should not be considered as such.

18             Mr. Hutchinson, you may proceed.

19             MR. HUTCHINSON:  Yes, Your Honor.

20             Good morning.  You just heard some of the jury

21   instructions from the Court, and I'm going to go over some of

22   those because I don't want -- I'm not going to state what the

23   law is.  The Court does that, and we'll just go off the jury

24   instructions that you have before you.

25             When it becomes the turn of defendants to come up

1    here and give their closing argument, you may very well hear a

2    lot about a blustery argument about the First Amendment.  The

3    First Amendment has limits.  You can't yell "fire" in a

4    theater, and you can't make damaging false statements about

5    people in public.  That's why it's such a -- why a defamation

6    claim can proceed in a courtroom, because there are limits to

7    that.

8            So let's go through -- I'm going to go through

9    Instruction No. 12, which is the law which the Court gives

10   you.  And as the Court told you, you guys are in charge of the

11   facts, to apply the facts to the law that the Court has given

12   you.  So let's go through those in Instruction No. 12.

13           That the defendants communicated a statement about

14   the plaintiffs.  They admit they did.  You've seen it in black

15   and white.  It's Exhibit 1.  So that one is not really up for

16   debate.

17           Number 2.  The statement was made to persons other

18   than the plaintiff by online publication concerning the

19   plaintiff.  The statement was definitely made online and

20   definitely made to others.  You can see all the people that

21   shared it and read it and commented on it on Facebook.  And on

22   defendants' own exhibits, the Google Analytics, you can see

23   that just on LifeNews.com website, not on any of the other

24   sources that were mentioned, you know, printouts, social

25   media, whatever, at least 17,000-plus people went to that

1  story.  So that should cover online -- that should cover "made

2  to persons other than the plaintiff."

3          That the statement was defamatory.  Okay.  I believe

4  that is Instruction 10, Defamation - Defined.  Defamation is a

5  statement about a person that exposes that person to wrath,

6  public hatred, contempt, or ridicule, or deprives that person

7  of the benefits of public confidence or social interactions.

8          You heard testimony by Mr. Byrd on behalf of himself

9  and on behalf of Restore Life -- corporations can't testify by

10 themselves; it requires people -- that he's been at grocery

11 stores, people have accosted him; he's been at Wal-Mart a

12 couple times, people have accosted him; that he tried to

13 donate food on behalf of his nonprofit to another nonprofit

14 that feeds the hungry, they didn't want to deal with him.  So

15 to say that, I think that very much hits the nail on the head

16 of wrath, public hatred, contempt, ridicule, and certainly

17 deprives that person of the benefits of public confidence and

18 social interaction.  You think about public confidence to go

19 about your business in your community.  When you can go to the

20 grocery store and get accosted, what kind of participation are

21 you allowed to have in your community at that point?  What

22 kind of social interaction are you going to have when you try

23 to go donate food and your food is not good enough for them?

24 So we believe that we've met number 3, that the statement was

25 defamatory.

1            Let's go to number 4.  The statement was heard or

2    read by persons other than the plaintiff who understood its

3    defamatory meaning and that it referred to the plaintiffs.

4    Well, we didn't go through them all because it was a stack

5    this high in Exhibit 14 of the printouts from the Facebook

6    page.  When they're talking about hanging people, boiling them

7    in oil, et cetera, I think people understand that they were

8    being accused of improperly dealing with fetal tissue, and it

9    made those people pretty angry.

10           Number 5, the statement was false.  Now, number 5,

11   this was admitted by defendants that it wasn't true, and it's

12   also in the stipulations.  Both parties agree, and it's put in

13   the jury instructions, that those statements about Restore

14   Life were not true.

15           So number 6, plaintiffs were injured by the

16   communication of the statement.  Now, you have heard testimony

17   over the past two days and mentioned it some just talking

18   about the definition of defamation.  You've got those public

19   interactions.  You've got the fact that Mr. Byrd has stepped

20   down as president of the nonprofit that he founded 29 years

21   ago.  You've got a loss to the company itself of its founder

22   in an attempt to put some distance between this story and the

23   company.  So those are certainly injuries, not being able to

24   be part of the community, not being able to continue to run

25   your business, that the business can't run in the way it's

1   been run for years, and can't participate in the community the

2   way it participates -- it has participated for years.

3            And then the last element, that the defendants

4   communicated the statement knowing that it was false or with

5   reckless disregard of whether it was false or not.  Now, this

6   one right here, this is -- you heard Mr. Ertelt.  He was

7   somewhat incensed that I had said in my opening that, hey,

8   this is -- this is a company that -- his company, and himself,

9   just kind of reprints other articles.  And he explained to

10  you, the jury, that they've got reporters and they make phone

11  calls and they talk to politicians and they talk to business

12  owners and they get their facts right and they do it daily, I

13  believe was his testimony, that that's how they operate.  But

14  in this case they managed to go and publish Restore Life's

15  website so that anybody who saw that defamatory article could

16  go right to the website, see who they were associated with,

17  see where they were located.  They didn't bother to send an

18  e-mail or a phone call, even though apparently he's got this

19  whole apparatus in place and do it daily to do so.

20           But, more importantly than that, we'll go to this

21  reckless disregard, Instruction No. 14.  In order to establish

22  the defendants communicated a statement with reckless

23  disregard of whether it was false or not, the plaintiff must

24  prove that defendants had a high degree of awareness that the

25  published statements were probably false or that the

1  defendants entertained serious doubt as to the truth of those

2  statements.  A mere failure to exercise ordinary and

3  reasonable care in determining the truth of the published

4  material does not, standing alone, mean that the defendants

5  have acted recklessly.

6         So this is an interesting case.  You have -- maybe

7  it's not enough that they didn't make that phone call or send

8  that e-mail, but when you're basing it off an article that --

9  you heard testimony from Mr. Ertelt, I was going to base this

10  off this Reuters article because they are a large news

11  organization, and they have vetted everything, and they get it

12  right, and so that's where I got my facts.  Well, you can go

13  back when -- you'll get a copy of the exhibits, and you can

14  look at Exhibit 3, and you can look at the first couple

15  sentences of Exhibit 3.  It talks about Arthur Rayburn [sic]

16  in Michigan.  It doesn't talk about James Byrd and Restore

17  Life.  So it can't be -- it's not a simple mistake when you've

18  got -- it's only five pages.  You're saying that's where the

19  facts are contained.  To not then use those facts accurately

20  that are printed in black and white -- we're not talking about

21  confusing somebody's testimony or some interview that you had

22  over the phone with some witness, you know, who happened to be

23  an unreliable witness.  We're talking about it was just

24  printed right there.  All he had to do was cut and paste, add

25  his take on it, you know, throw in the word "abortion," which

 1    was not mentioned in the Reuters article, and we wouldn't be

 2    here today.

 3            So we believe that there was certainly -- it

 4    certainly meets the reckless disregard standard.  We're not

 5    alleging simple negligence, because if we thought that's all

 6    it was we wouldn't be here.

 7            Now, we went over all those elements, all seven

 8    elements, and either the testimony or the stipulations,

 9    they're really all met.  So defendants -- and you heard,

10    through Mr. Ertelt, their only real way to try to unwind this

11    is to say, Hey, it was a mistake, I just made a mistake, we

12    all make mistakes, this time I made a mistake.  But if that's

13    what's allowed in the justice system, to just come in, no

14    matter what behavior you have done, no matter what injuries

15    you have caused, to simply show up and say, Hey, it's a

16    mistake, you know, how is the criminal justice system going to

17    run like that?  You've got somebody who committed an assault.

18    Hey, it was a mistake.  Don't hold me accountable.  You've got

19    somebody who injures you in a car wreck.  Hey, it was a

20    mistake.  I shouldn't be held accountable.  Somebody -- a

21    surgeon commits malpractice, injures you terribly.  Should

22    they be allowed just to come in and say, Hey, don't hold me

23    accountable?  I know it meets all the elements of this, but it

24    was a mistake.  I shouldn't be held accountable.

25            And so, you know -- and the mistake you will

1   describe, and you heard it described some on the stand, is

2   that, you know, Sure, I should have said Arthur Rayburn [sic].

3   I should have talked about his company; that's who I should

4   have talked about.  And that's right, because that was the

5   first two sentences of the article that he apparently got his

6   facts from.  He should have done that, but he didn't because

7   he was reckless.  But that kind of argument is, you know --

8   Well, I should have hit -- I should have hit Mr. Rathburn with

9   a baseball bat, but mistakenly I hit -- I hit Mr. Byrd.  So,

10  guess what, don't hold me accountable because it was a

11  mistake.  It doesn't matter how injured you were.  It doesn't

12  matter what the problems are, doesn't matter that you can't go

13  to the grocery store, doesn't matter that you had to step down

14  from your job.  All that matters is I made a mistake.

15          So getting damages, assigning damages in this type of

16  case is difficult.  You know, as the Court read in the

17  instructions, you know, we don't have -- you know, we are not

18  required nor did we put on a witness that put a dollar amount

19  to that, but that's, you know, for better or for worse, just

20  kind of thrown in the jury's lap to do with what they will.

21          I've given it some thought, and, you know, you've got

22  to think about, What's a company's reputation worth?  This is

23  a nonprofit corporation that helps -- that helps people, helps

24  research.  What's that reputation worth?  Corporations spend

25  millions of dollars a year to try to have a great reputation.

```
 1   Look at the side of any bus or, you know, all the ads that
 2   interrupt your streaming.  They spend just literal fortunes
 3   trying to have a good reputation.  And you get something like
 4   this out -- and you've heard the testimony, it's been
 5   devastating to my clients -- and that's gone.  What's that
 6   worth?  You know, what's it worth to have to step back from
 7   your company and not be the face of that anymore?  What's that
 8   worth that Mr. Byrd had to be found in his company bathroom
 9   with his pants down around his ankles and taken to the
10   hospital by his coworkers?  You know, it's hard to put a
11   dollar value on reputation and embarrassment, and it's hard to
12   put a value on, well, you know, we're not -- we no longer get
13   babies from St. Jude's, so we don't get to participate in some
14   of the childhood cancer studies.  What's that worth to Restore
15   Life?  What's that worth to Mr. Byrd?  What's that worth to
16   those children who aren't getting potential new treatments?  I
17   don't know what that's worth, but I'm going to -- but we have
18   to put a number on it because, just like I told you in
19   opening, you know, it may not be a perfect remedy for these
20   types of things, but here in the civil justice system what the
21   remedy is is generally money.  And when you're thinking about
22   this money, I want you to think about some of Mr. Ertelt's
23   testimony.  I asked him, you know, why haven't you just
24   printed a retraction?  If you're into the truth and it's just
25   a simple mistake, why did you -- why has an article not been
```

 1   published that says, you know, Hey, I was wrong, it should

 2   have been Arthur Rathburn, these guys did nothing wrong, and

 3   put that out in the public sphere?  He said, Well, I'm waiting

 4   for your clients to do it.  But I asked him, You're in charge

 5   of LifeNews.com.  You are the publisher.  You can put that up

 6   any time you want.  You don't need permission from us.  We're

 7   not in charge of your website.

 8          So here we are almost four years later, still hasn't

 9   been done.  Anybody who read that article, over 17,000 people

10   at least that we know of, are led to believe that that's still

11   true, even though defendants here in court admit that it's not

12   true.

13          So I'm going to ask for a minimum in compensatory

14   damages of $900,000.  We're not asking for some 10 million

15   bucks, some giant lottery payday, but it's worth something,

16   your reputation.  It's worth something, not being able to go

17   out in public without being harassed.  It's worth something to

18   have that -- when you can't participate in society anymore,

19   when you have to step back from your job, when people in your

20   small-town Appalachian community don't even want your free

21   food to feed hungry people.

22          And we're also going to ask for punitive damages, and

23   we think they are warranted for both the reasons you are

24   allowed to ask for punitive damages.  The first reason is to

25   punish these defendants, which, you know, again goes back to

1   the things like a retraction.  Why did it happen?  I mean, as

2   far as the public knows, what's in that Exhibit 1, the

3   LifeNews.com article, that's the truth as far as they know.

4   They haven't cleaned this up, and they're not sorry.  It's

5   just a mistake in their book, so they shouldn't be held

6   accountable.  And in this day and age, it's not just

7   LifeNews.com.  There are all types of specialty websites out

8   there, big and small, that just take whatever they want and

9   play fast and loose with the facts to suit their agenda and to

10  have -- and to please their specific audience.

11          If you will go back to Exhibit 1 and think, the very

12  first line at the bottom, I asked Mr. Ertelt to read that.

13  It's on the first page, and it's one line at the bottom, and

14  it says, This is going to put a spotlight on -- I believe

15  the -- along the lines of the sale of aborted -- aborted

16  children or tissue or something like that.  That's not what

17  the Reuters article was about.  This article not only -- and

18  it kept saying, We're not sure whether it was from abortion or

19  not.  Also not from the Reuters article.  Don't let them try

20  to pretend that that's for clarity.  That's to appeal to their

21  audience.  And that's why these things get changed.  That's

22  why they become more salacious.

23          And all these websites, all these news outlets, not

24  just LifeNews.com, need to understand that it is outrageous

25  and not acceptable to just say whatever you want to say to

1    please your readers, facts be damned, and I don't care who it

2    harms as long as I'm getting clicks.

3              Thank you.

4              THE COURT:  All right.  Thank you.

5              MR. HUTCHINSON:  Oh, and I didn't put a number on

6    that one.  The punitives, we're asking for 1.6 million.

7              MR. VENTOLA:  You know, Judge Domenico said before

8    closing arguments started that the statements made in closing

9    argument aren't evidence, and that's true, but a closing

10   argument can at least refer to the actual evidence, remind you

11   of the actual evidence.  Counsel's closing argument just now

12   had absolutely nothing to do with the evidence.  It was things

13   he dreamed up.

14             And if you will remember from opening arguments,

15   after counsel made an opening argument that made a number of

16   assertions, I said, I'm going to come back in closing

17   arguments and challenge all those assertions they made and

18   show you they weren't true.  And I'm going to remind you of

19   that now.

20             In opening argument, counsel said, Hey, LifeNews

21   doesn't write any original material, and now they're backing

22   off and say, Okay, that was not true what we said.  They made

23   that up.

24             The next thing they said is that LifeNews had sort of

25   a business model of writing article after article that's false

1   and just getting people to click on it and, you know, make

2   money from telling lies.  And they had no proof of that at

3   all.  In all of the thousands of articles that LifeNews has

4   written, they talked about two, and in both those cases, in

5   fact, they were wrong.  The articles were correct.  So, again,

6   they try to hep you up on some story about some kind of

7   clickbait mill that publishes false articles, and it was false

8   from the get-go.

9          They tried to tell you that Restore Life lost

10  business because of the LifeNews article, and they have

11  provided absolutely no evidence of that at all.  They don't

12  give you any business records to show that they lost revenue.

13  They don't give you any analysis to show people who -- who

14  were dealing with them and stopped.  They didn't even tell you

15  how much business they lost.  They didn't even give you a

16  number.  They just said, Trust us, we lost business.  We're

17  not going to show you any records.  We're not going to show

18  you our own records.  We're just going to say hope you believe

19  that.  No records, no data, no numbers at all.

20         Now, the Judge told you in Instruction 13 that in

21  order to prove damages -- no, I'm sorry -- yeah, Instruction

22  13, in order to prove damages they have to establish they were

23  injured by the communication of the statement.  We'll talk

24  about that, must prove actual damages beyond mere annoyance or

25  loss of peace.  Evidence that someone refused to deal with a

1   plaintiff is insufficient to establish a statement injured the

2   person without proof the statement was the cause of the person

3   not dealing with the plaintiff.

4          Not only do they not give you proof that the LifeNews

5   article was the cause of anybody not doing business with them,

6   they don't even identify anybody who they say doesn't do

7   business with them because of the LifeNews article.  And why

8   don't they?  Why don't they give you this evidence?  They

9   called it a surprise exhibit, but it comes from our own

10  website.  And they say in the website -- it's the only record

11  we have from them.  They didn't bring any of their own, but we

12  were able to find something on their website:  Since November

13  of 2017 we have seen a large increase in the number of people

14  donating their body to Restore Life, the largest increase in

15  donors ever experienced.  We have also seen an exponential

16  increase in research and education partners since November of

17  2017.

18          So they try to come in with a story that's not true.

19  And part of this story that they are coming in is they are

20  saying, Well, all of our problems are because of LifeNews, the

21  article that 17,000 people clicked on.  That is the problem of

22  all our problems.  That's why Mr. Byrd claims that he stopped

23  being the founder.  They completely ignore the fact that a

24  huge international news organization wrote a long hit piece on

25  them, page after page after page, about LifeNews -- I mean,

 1   about Restore Life and specifically Mr. Byrd, directly

 2   criticizing them.  Sloppy, took advantage of the poor, didn't

 3   use proper records or documentation, improper practices, page

 4   after page after page.  And Mr. Byrd says, well, he left, he

 5   left Restore Life because his name was attached to it.  The

 6   LifeNews article never even mentioned Mr. Byrd, not once,

 7   nothing about him, not his name, not anything about him, but

 8   the Reuters article hit him repeatedly.  If it was because of

 9   bad publicity that Mr. Byrd left Restore Life, it was because

10   of the Reuters article, not because of anything LifeNews said,

11   because LifeNews didn't mention Mr. Byrd's name at all.

12          They said in opening argument that the argument [sic]

13   was seen by more than a hundred thousand people.  No proof of

14   that.  In fact, it was only 16,000.  Exhibit 34 shows you

15   that.  Only 583 in Tennessee who even clicked on the article.

16          They say that Mr. Byrd suffered medical damages of

17   some kind.  Don't give you any bills.  They don't bring a

18   doctor or the doctor's records.  They don't give you any

19   evidence that any -- of any medical damages at all.  And they

20   admit that to the extent that Mr. Byrd has seen doctors, he

21   never talked about Restore -- LifeNews or the article or

22   stress from that.  He did talk about a fight with his son

23   where he threw a flashlight at him because it wasn't working.

24   Found time to talk to that about -- to his doctors.  But

25   there's no proof at all that he even claimed to his doctors

1    that he had a problem with the LifeNews article.  And it's

2    proof they could have brought.  They could have brought his

3    doctors.  They could have brought the records, medical bills,

4    and they do nothing like that because it doesn't support their

5    story.

6            Said in opening argument that LifeNews had said that

7    Restore Life had acted illegally in the article.  That's

8    absolutely not true.  And you'll remember that Mr. Byrd came

9    up to the stand and said, Well, I know these statutes, and

10   they say using fetal tissue is illegal, but as the Judge told

11   you, his statements regarding it are not what the law was.

12   You saw the law presented to you in the court, and you have

13   the law given to you by the Judge in Exhibit [sic] 11, and it

14   says that use of fetal tissue, selling fetal tissue, is not

15   illegal unless it comes from abortions or that the action

16   affected interstate commerce and it was sold in excess of

17   reasonable payments for recompensation of expenses.  That's

18   what it takes to say that selling fetal tissue is illegal, and

19   LifeNews never said that in this story, either one of those

20   things, specifically said, We don't know whether it comes from

21   abortions, twice.  So they didn't make that representation.

22   And they didn't make the representation it was used in

23   interstate commerce.  And they didn't make the representation

24   that they charged so much that it exceeded their costs.  They

25   never said any of those things.  So despite Mr. Byrd's

1   assertions about what the law is and their assertions that

2   LifeNews said they acted illegally, they never did.

3            What they did give you was changing stories.  How

4   many times did Mr. Byrd say something that was contradicted by

5   what he had previously said in a deposition?  How many times

6   did they say things that are contradicted by the evidence that

7   you see here in this courtroom regarding whether they lost

8   business, regarding whether the sale of fetal parts is

9   illegal?  They are repeatedly saying things that are

10  contradicted by the evidence.

11           Now, Counsel talked about Instruction 10, and he

12  said, If you look at Instruction 10, these statements were

13  defamatory because there were people in our community who

14  didn't like us.  Instruction 10 doesn't talk about the

15  reaction; it talks about the statement.  They have to prove

16  that the statement itself was defamatory.  If somebody is

17  looking at a nondefamatory statement, a statement that you

18  didn't act illegally and we don't know if you used aborted

19  fetal tissue, if somebody takes that and says, Hey, you're

20  using aborted fetal tissue, we don't like you, that's not a

21  statement about -- that's not a description of the statement.

22  They have to prove that the statement is defamatory.  They

23  can't prove it just by talking about what they claim.  And, by

24  the way, they don't bring one person in who's supposedly had

25  this reaction.  But they can't prove it by these claims they

1    have of people who negatively reacted.  They have to prove it

2    by the statement, and they can show nothing about the

3    statement that was defamatory.

4          Counsel talked about Exhibit 14.  They say, Oh, you

5    were damaged because all these people had a negative reaction

6    to Exhibit 14.  Exhibit 14 doesn't even mention either

7    Mr. Byrd or Restore Life.  It just talks about a biotech firm

8    which, in fact -- hoping this gets in focus; I'm not sure how

9    I do that -- oh, there we go -- just talks about a biotech

10   firm.  Doesn't say who it was, where it was.  Like the article

11   itself, it doesn't even mention Mr. Byrd, and it doesn't even

12   mention LifeNews [sic].  Now, they're saying, Well, a lot of

13   people said, hey, I don't like that, in the Facebook comments

14   to the story -- to the posting, but we have no idea whether

15   any of those people actually clicked on the story and read it

16   itself or they are just reacting to what's here about a

17   biotech firm.  We know very few people actually did click the

18   article from the records, from the data.

19         They say you could have done a better job.

20   Mr. Ertelt made an error.  He read an article that talked

21   about this biotech firm that had fetal body parts, and the

22   article later mentioned LifeNews [sic], didn't mention the

23   name of Mr. Rathburn's company -- I mean, I'm sorry, the

24   article mentioned Restore Life, didn't mention the name of

25   Mr. Rathburn's company, and Mr. Ertelt made an honest mistake

 1   that Restore Life was it.  And they, even now in closing

 2   arguments, they can't deny that it was an honest mistake.

 3           And you heard the testimony that Mr. Ertelt has no

 4   problem with Restore Life.  He appreciates the job that they

 5   do.  He had no reason to dislike them.  Didn't even talk about

 6   Mr. Byrd, but if he had, he had no reason to be against

 7   Mr. Byrd.  He had no reason to say something false about them.

 8   There is absolutely no evidence to indicate that he knew that

 9   he was misidentifying the company.

10           Now, counsel apparently doesn't like the law.  He

11   says, Well, the instruction says that you have to show -- and

12   we'll look at the instruction again.  It's Instruction 14.

13   The instruction says that you have to prove that the

14   defendants had a high degree of awareness, knowing that the

15   published statements were probably false, or that they

16   entertained serious doubt about the truth of the statements.

17   They make no effort to even pretend that that happened.  They

18   don't even pretend that Mr. Ertelt did this.  Oh, I don't know

19   if this is right; I'm just going to put it down.  They admit

20   that it was a mistake, but what they say is:  Well, that's not

21   fair, that's not fair.  I mean, in the law if you have a car

22   accident, you can't say, I didn't know I was driving too fast.

23   So they get compensation in a car accident; we should too.

24   That's not the law, and you are required to follow the law

25   instructed to you by the Judge.

Julie H. Thomas, RMR, CRR                                (303)335-2111

1          And, yes, I am going to talk about the First

2   Amendment, that is right, the guarantee given to us by our

3   Constitution that you don't get held liable because of

4   negligence like you do in a car wreck.  And it's wrong for him

5   to say that you should evaluate this case like a car wreck.

6   You should evaluate the case like the Judge says according to

7   the First Amendment.  And a simple mistake is not enough.

8   They have to prove much, much more.  And they have to prove

9   that by clear and convincing evidence, not just a

10  preponderance of the evidence, but by clear and convincing

11  evidence.

12          Let's look at that instruction, Instruction 3.  They

13  have to show there is no serious or substantial doubt about

14  it.  There has to be no serious or substantial doubt that

15  Mr. Ertelt just sort of deliberately, Ah, I don't know, I

16  don't know if this is about them, but I'm going to just say

17  it.  The evidence has to have such convincing force that it

18  produces in your mind a firm belief or conviction about the

19  correctness of the conclusion.  They have not only not clear

20  and convincing evidence, they have zero evidence.  They told

21  you they were going to come in and talk about a business model

22  where they just say things that aren't true, but they didn't

23  produce that evidence.  And they produced no evidence at all

24  regarding this article.  They completely failed to provide

25  evidence, much less clear and convincing evidence.

1          And counsel went through all of the elements that you

2     are going to look at in order to find liability, and he wants

3     you to think, well, you know, some of these are proven, so

4     just, you know -- that's enough, but that's not enough.  In

5     Instruction 12 you have to find every single one of these

6     elements as to each plaintiff in order to find for that

7     plaintiff, every single one.  If there's one that you don't

8     find, you have to find in favor of the defendants.

9          And I'm not going to tell you how to do your jobs,

10    but I'm going to make a suggestion to you.  It's up to you.

11    Number 7 is the one that has to be proven by clear and

12    convincing evidence.  They absolutely cannot prove that.  If

13    you can look at number 7, that it was done with that knowing,

14    knowing that it was false or knowing that you didn't know if

15    it was false, if you can't find that one, both cases of both

16    defendants [sic] go out.

17         But I do want to mention something else about one of

18    the other elements.  They say that number 1 is proven.  It's

19    not -- not as to Mr. Byrd.  The article never mentions

20    Mr. Byrd.  So number 1 is absolutely false as well as to

21    Mr. Byrd.

22         Number 2 is true.

23         Number 3 is, as we said, not true because the

24    statement, not the reaction.  Oh, somebody told me at

25    Wal-Mart -- and, again, this is one of the things Mr. Byrd

1   changed his story on, but, Oh, somebody at Wal-Mart said

2   you're doing bad stuff with babies.  That's not the standard.

3   You have to look at the statement, whether the statement was

4   defamatory, and the statement did not say they dealt with

5   fetuses, did not say they did anything illegal, specifically

6   said they didn't know whether or not they dealt with fetuses.

7   No false statement.

8           There are false statements in that they say they

9   don't use fetal tissues, but it's not defamatory.  And we

10  talked about this in voir dire and in opening.  There is no

11  reason in anyone's mind, nobody has come forward with a reason

12  for saying dealing with fetal tissue that does not come from

13  abortions is any worse than dealing with tissue from babies,

14  babies that had been born and died, no additional negative

15  connotation.  There's not one person who says it's wrong to

16  deal with fetal tissue but it's okay to deal with baby tissue.

17          So even though they were wrong to say that Restore

18  Life was dealing with fetal tissue, that's not a defamatory

19  statement.  It's not saying they did anything illegal, and

20  it's not saying they did anything wrong, because everybody

21  agrees, and Restore Life does deal with baby tissue.  It's no

22  different than dealing with baby tissue.

23          You have to look at the statement to see if it's

24  defamatory, not just bring up the stuff about a lot of people

25  didn't like us, which again I'll suggest is from the Reuters

1   article.

2          And then the sixth element was injury, and again they

3   can't proffer you any proof, any data at all of any injury

4   from the LifeNews article, as opposed to the Reuters article.

5          They say you could have printed a retraction.  It's

6   the first time we're hearing about this request for a

7   retraction.  In fact, Mr. Byrd said when he contacted LifeNews

8   that he didn't want a retraction.  What did he say?  Exhibits

9   36, 35 and 36.

10          I apologize for me fumbling with this notebook.  It's

11   hard to turn the pages sometimes.

12          Exhibit 35, he says that he wants the story removed

13   or corrected.  So he doesn't want a news story talking about

14   Mr. Byrd or LifeNews saying a retraction.  He says remove it

15   or correct it.  And the undisputed evidence is as soon as

16   Mr. Ertelt got this letter -- now, there was a significant

17   delay because it went into his spam folder.  That's

18   undisputed.  As soon as he got that, he did exactly what

19   Mr. Byrd requested.  He removed it.

20          And in Exhibit 36 he again says, If the story is not

21   removed or corrected and we are issued an apology, litigation

22   will begin this week.  Does not request a retraction.  Wants

23   it removed or corrected.  And, in fact, the undisputed

24   testimony -- they could have responded to this that it wasn't

25   true, but they didn't -- is that Mr. Ertelt contacted Mr. Byrd

1    and said, Hey, I took that story down, and repeatedly asked

2    him, Do you want a retraction, and Mr. Byrd never responded to

3    any of those communications.  But now they want to come in

4    here and say, Oh, there should have been a retraction.

5            In fact, it's irrelevant.  Whether or not there's a

6    retraction doesn't affect whether or not the story itself was

7    defamatory or was written with the actual malice required

8    under the Judge's instructions.  But I wanted to respond to

9    what they were saying about retraction.

10           And again I'll point out that this same letter

11   Mr. Byrd -- although they now want to say, Ah, you know,

12   LifeNews is a terrible place where, you know, it's totally

13   nothing but seedy, salacious stories that are false, Mr. Byrd

14   even admitted, You do good work, about the LifeNews site,

15   didn't say anything about, Oh, you guys deliberately publish

16   false stuff.  That's a story that was made up for court, and

17   there's no basis for it.

18           In fact, even if you believed that there was

19   something defamatory about the article, the effect of it would

20   pale in comparison to the Reuters article against them, a long

21   series of articles from a national news source where they were

22   criticized by several doctors, people from a university,

23   criticized by a U.S. senator from their state where it said

24   they took advantage of poor people who lost their son, they

25   were sloppy, failed to give required documentation and

1   incomplete reference.

2          Now, Mr. Byrd says that in some of these cases some

3   of the things that Reuters said about them were false, not

4   really true.  And he may be right about that.  I don't know.

5   But, nevertheless, all of this information in this long hit

6   piece came out in this national news organization, and they

7   drew criticism from doctors and universities and researchers

8   and a U.S. senator, as compared to the small number of people

9   who saw this, the LifeNews article.  They say, Well, Mr. Byrd

10  had to withdraw from being president.  It's because the

11  Reuters article referred to him repeatedly, had his picture,

12  gave his life story, linked him to that company, and they

13  wanted to avoid that.  The LifeNews article never even

14  mentions Mr. Byrd.

15         Now, I want to remind you that when you look at

16  Instruction 14, which gives you the very, very high standard

17  of knowledge of falsity that has to be proven in order to

18  satisfy either case, either Mr. Byrd's or LifeNews [sic], it's

19  an absolute required element.

20         And I'm doing this just because you have to flip

21  pages a little bit to get to this, but as to that standard in

22  Instruction 14, Instruction 12 tells you -- it calls it

23  element 7, and it tells you that it must be proven by clear

24  and convincing evidence.  And we have already talked about --

25  I believe it was Instruction 4 that gives a standard for clear

1    and convincing -- I'm sorry, Instruction 3 that gives a

2    standard for clear and convincing evidence.

3           So when you're looking at Instruction 12, remember --

4    I'm sorry, Instruction 14, remember that you have to follow

5    that standard of clear and convincing evidence.  So not only

6    would you have to find awareness that the published statements

7    were probably false or entertaining serious doubt about the

8    truth of the statements, you not only have to find that, but

9    you have to find that by clear and convincing evidence.  And,

10   again, not only is there not clear and convincing evidence,

11   there's zero evidence.

12          And counsel tries to avoid it by saying:  Ah, it's

13   not fair.  If I'm in a car wreck and somebody was negligent,

14   somebody didn't use sufficient care, I should get compensated,

15   so you should compensate us too.  That is not the law, and I'm

16   asking you to follow the law that the Judge gives you in the

17   instructions.

18          How much time?

19          COURTROOM DEPUTY:  You've got four minutes left.

20          MR. VENTOLA:  Four minutes?  I'm not sure if there's

21   anything I can cover in four minutes, but let me see.

22          I guess I'll spare the four minutes.  Thank you very

23   much.

24          No, there is something I want to say.  I'm sorry I'm

25   using more of your time, but I really do appreciate the

 1   attention that you have all shown, not only during this

 2   closing argument but throughout the trial.  And on behalf of

 3   myself and Mr. Ertelt and LifeNews, we appreciate the

 4   sacrifice that you are making.  And I know that it is one to

 5   come and enforce the rights that are established, that, yes,

 6   are established by our Constitution, and I appreciate the

 7   effort that you made.  Thank you.

 8          THE COURT:  Thank you, Mr. Ventola.

 9          Mr. Hutchinson, I believe you have 10 minutes left.

10          MR. HUTCHINSON:  All right.  We've got -- I want you

11   to ignore the blustery talk and -- about the First Amendment

12   and about how we don't get any of the facts right.  You guys

13   are in charge of the facts, not me, not Mr. Ventola.  I told

14   you that when I was up here.  And so there's just a couple

15   things I'd like to straighten out.

16          Now, he says, Ah, Mr. Byrd must have been harmed by

17   the Reuter's article, not this LifeNews article.  The Reuters

18   article more than once, and including from the lady who said

19   that it was sloppy, we had that read out in court, said that

20   they had done nothing -- nothing illegal whatsoever.  It was

21   very clear that they thought that that industry should

22   probably have more regulation, but they made it super clear

23   that everything was aboveboard.

24          And then we go to the LifeNews article.  It was

25   Exhibit 1.  And Mr. Ventola -- I mean, I guess he has to on

 1   behalf of his client -- says that somehow this isn't

 2   defamatory.  It's got this picture right up front that's

 3   grisly.  I mean, that's showing -- that's showing right there

 4   how Restore Life does business to the readers, right there.

 5           And you want to talk about, you know, Mr. Ventola

 6   says, Well, obviously he had to withdraw from being president

 7   because of the Reuters article.  You know what, the Reuters

 8   article didn't say that he was selling the heads of unborn

 9   babies.  That is a salacious accusation that is absolutely

10   defamatory and has had strong reactions that we described in

11   his town of 13,000 people in conservative Appalachia.  Having

12   an article like this here in Denver may not do as much, but it

13   is -- it has not been great.

14           Now, there was a lot of talk about whether this was

15   illegal, whether it was done illegally.  Mr. Ventola wants to

16   talk about interstate commerce.  Whether it was illegal or

17   not, as you will see in that instruction, has nothing to do

18   with whether we meet the seven elements.  I would argue that

19   it probably is.  We talked about interstate commerce.  What

20   are they accused of doing?  Selling body parts, fetal tissue,

21   from Tennessee to Minnesota.  That's two different states,

22   commerce one to another.  And to not be alleging that these

23   parts were -- were -- that they were alleging these parts

24   might very well be aborted baby parts is completely

25   disingenuous.  Here's that first line I was telling you about

 1   that I couldn't remember the exact quote: *once again putting*

 2   *a spotlight on the sale of aborted baby parts.*  Go to the next

 3   page: *selling the heads of unborn babies.*  We don't know if

 4   they came from abortions.  They have absolutely made that

 5   accusation.

 6           Now, during the course of this trial, and in a lesser

 7   extent here in closing arguments, Mr. Ventola made -- was

 8   making the argument, and you might have heard during the

 9   course of the trial, he'd say -- and he asked Mr. Ertelt about

10   it, and he brought it up again:  Did you know Restore Life?

11   Did you know Mr. Byrd?  Implying that you couldn't have --

12   that you just can't be found liable for defamation unless you

13   know people and you hate them.  That's not true.  That's not

14   the law.  And if it were true, the only people you could sue

15   for -- who lied about you in a public forum, causing damages,

16   would be your friends, family, and acquaintances.  That would

17   be the only people, you know, your sister or your cousin or

18   that guy you went to school with, you could sue him, that's

19   it.  Couldn't sue anybody else.  That's not the law that he

20   had to know them and have specific ill will towards those

21   companies.  And that was said multiple times and certainly

22   implied during this closing.

23           And you look at those two e-mails that were sent by

24   Mr. Byrd.  Tries to say, Oh, we didn't even know you wanted us

25   to print a retraction.  It said removed or corrected.  They

Julie H. Thomas, RMR, CRR                              (303)335-2111

 1   want the record set straight.  That's one of the reasons we're

 2   here today is that, you know, so maybe Restore Life can not be

 3   looked at as such a pariah in the community that nobody will

 4   even take their food to feed the needy, of which there are

 5   many in Appalachia, and so Mr. Byrd can go to the grocery

 6   store and not have people talk about baby heads to him.  The

 7   Reuters article didn't mention baby heads, didn't say that,

 8   didn't say anything about abortion either.  That word is not

 9   in that article one time.

10          And so, to close, of course, appreciate your time

11   just like Mr. Ventola, but I'm going to ask you to punish not

12   only these defendants but other defendants who might be

13   willing to do the same thing, to give them pause before they

14   behave like this, before they ruin people's lives, ruin

15   people's jobs, ruin people's companies because they can't --

16   because they don't have their facts right.

17          Thank you very much for your time this week.

18          THE COURT:  Thank you, Mr. Hutchinson.

19          All right, ladies and gentlemen of the jury, you have

20   now heard the evidence in this case.  You have been instructed

21   as to the applicable law and heard the parties' closing

22   arguments, which I will remind you are not the evidence or the

23   applicable law.  But you are now in charge of the case and

24   will retire to commence your deliberations.  Remember only to

25   discuss the case when all of you are present and together.

 1            You may deliberate for as long as you need to reach

 2    your verdict.  If we haven't heard back from you by around

 3    4:30 today, we will come check and probably bring you back in

 4    and dismiss you for the day, and then you'll be able to resume

 5    deliberations at whatever time you want tomorrow.

 6            Mr. Keech, with that, would you provide the official

 7    instructions and verdict form to the Court Security Officer,

 8    who will take the jury to the deliberation room, and please

 9    swear him in.

10            COURTROOM DEPUTY:  Please raise your right hand.

11        (Court Security Officer sworn.)

12            THE COURT:  All right.  Thank you.  If you would take

13    the jury back, please.

14            COURTROOM DEPUTY:  All rise.

15        (Jury out at 11:48 a.m.)

16            THE COURT:  All right.  Let's take our seats.

17            Counsel, anything else to take up at this time?

18            MR. VENTOLA:  No, Your Honor.

19            MR. HUTCHINSON:  No, Your Honor.

20            THE COURT:  All right.  Mr. Keech, do you have means

21    of getting in touch with counsel if we hear back from the

22    jury?

23            COURTROOM DEPUTY:  Yes, Your Honor, I do have phone

24    numbers.

25            THE COURT:  All right.  Very good.  Try to remain

1   within 10 minutes or so of the courtroom, if you can, for the

2   rest of today.  And as I mentioned, if we haven't heard from

3   them by 4:30, you should probably be back here because we will

4   bring them back and go from there.

5          If there's nothing else, the Court will be in recess.

6      (Proceedings recessed 11:49 a.m. to 4:08 p.m.,

7       resuming outside the presence of the jury.)

8          THE COURT:  Please take your seats.

9          Counsel, we have received a note from the jury's

10  foreperson that the jury has reached a verdict.  Shall we

11  bring them in to read the verdict?

12         MR. HUTCHINSON:  Yes, Your Honor.

13         MR. VENTOLA:  Yes, Your Honor.

14         THE COURT:  All right.  Mr. Keech, would you bring

15  the jury in, please.

16      (Jury in at 4:10 p.m.)

17         THE COURT:  All right.  Welcome back.  Please, let's

18  take our seats.

19         Would the foreperson of the jury please stand and

20  identify yourself.

21         JUROR NO. 1:  Ann Hutchinson.

22         THE COURT:  Thank you, Miss Hutchinson.  Has the jury

23  reached a unanimous verdict concerning all the claims in this

24  case?

25         JUROR NO. 1:  We have.

1           THE COURT:  All right.  Have you and all the -- well,

2    I guess, have you signed the applicable verdict forms?

3           JUROR NO. 1:  I have.

4           THE COURT:  All right.  Thank you.  Would you please

5    hand the forms to the security officer.

6           And would you please hand them to me.  Thank you.

7           So I will review these and then read the verdict

8    form.

9           All right.  I will now read the verdict form.

10          Question 1.  Did Restore Life USA, Inc., prove the

11   elements of its defamation claim against LifeNews.com and

12   Steven Ertelt as described in Instruction No. 12?

13          Answer:  No.

14          And then skipping -- Questions 2 and 3, based on

15   that, are skipped.

16          Question No. 4.  Did James Byrd prove the elements of

17   his defamation claim against LifeNews.com and Steven Ertelt as

18   described in Instruction No. 12?

19          Answer:  Yes.

20          Question 5 and 6 are answered because Question 4 was

21   answered.

22          Question 5:  Based on Instruction No. 16, state the

23   amount of compensatory damages you find will fairly and

24   adequately compensate James Byrd for the injury caused by

25   LifeNews.com's and Steven Ertelt's defamation.

1           And the jury has filled in $500,000.

2           Question No. 6(a).  Based on Instruction No. 17, do

3    you find that LifeNews.com and Steven Ertelt are guilty of

4    actual malice or wanton, reckless, or willful misconduct

5    towards James Byrd?

6           Answer:  Yes.

7           Then Question 6(b) is answered.  State the amount of

8    punitive damages, if any, you award James Byrd for the purpose

9    of punishing LifeNews.com and Steven Ertelt for their

10   defamation and serving as an example to others.

11          The answer filled in:  $450,000.

12          The signature is signed by the foreperson and dated

13   this 9th day of June, 2022.

14          I will now ask the courtroom deputy to poll each of

15   the jurors to ensure this is their verdict.

16          COURTROOM DEPUTY:  Ann Hutchinson, was this and is

17   this your verdict?

18          JUROR NO. 1:  Yes.

19          COURTROOM DEPUTY:  Janice Hueske, was this and is

20   this your verdict?

21          JUROR NO. 2:  Yes.

22          COURTROOM DEPUTY:  Shaena Florence, was this and is

23   this your verdict?

24          JUROR NO. 3:  Yes, sir.

25          COURTROOM DEPUTY:  Lori Hanson, was this and is this

 1    your verdict?

 2              JUROR NO. 4:  Yes.

 3              COURTROOM DEPUTY:  Ryan Suazo, was this and is this

 4    your verdict?

 5              JUROR NO. 7:  Yes.

 6              COURTROOM DEPUTY:  Grace Paquette, was this and is

 7    this your verdict?

 8              JUROR NO. 6:  Yes, sir.

 9              COURTROOM DEPUTY:  Michael Cox, was this and is this

10    your verdict?

11              JUROR NO. 5:  Yes.

12              COURTROOM DEPUTY:  The jury has been polled, Your

13    Honor.

14              THE COURT:  Thank you.

15              Ladies and gentlemen of the jury, you have now

16    completed your duties in this case, and in a moment I will

17    discharge you, with the thanks of the Court.

18              Given my previous instructions to you about not

19    discussing the case, you may wonder now whether you may do so.

20    The answer to that is yes.  You may now discuss any aspect of

21    this case with anyone you choose.  It is proper generally for

22    others to discuss the case with you, and you may talk with

23    them as much or as little as you like, but if anyone persists

24    in talking to you about this case over your objection or if

25    they become critical of your service either before or after

 1   any discussion has begun, please report it to me.

 2          In addition, our local civil rules prohibit the

 3   parties or counsel from talking with you unless they have

 4   obtained an order from me authorizing them to do so.  So in a

 5   minute I'll discharge you, but I'll ask you to stay for a few

 6   minutes because I'll come back and thank you in person, but

 7   also I'll ask you how you want me to handle that.  So that is

 8   my answer to that question.

 9          With that, you are discharged from your duties in

10   this case.  I thank you.  The parties thank you.

11          And, Mr. Keech, would you please take the jury back

12   to the deliberation room.

13          And if you would just please wait a few minutes until

14   I can come back and thank you.  So thank you very much.

15          COURTROOM DEPUTY:  All rise.

16      (Jury out at 4:16 p.m.)

17          THE COURT:  All right.  Let's briefly take our seats.

18          Counsel, if you wish to renew any motions or file any

19   motions, please do so in writing pursuant to Rule 50 or any

20   other rule.

21          Is there anything else you wish to take up?

22          MR. VENTOLA:  So, Your Honor, you previously

23   indicated that motion for directed verdict would be taken

24   under advisement.  When you say do I wish to -- do I need to

25   renew those at this time?

1      THE COURT:  Yes, but please file something in writing

2  under Rule 50, please.

3      MR. VENTOLA:  Okay.  Your Honor, is there -- I mean,

4  there may be a date in the rules.

5      THE COURT:  I think there's a 28-day limit in the

6  rule.

7      MR. VENTOLA:  And I just want to say, Your Honor,

8  that there definitely will be motions.

9      THE COURT:  I am not surprised.  Yes, I appreciate

10  that.  Thank you.

11      Anything else?

12      MR. HUTCHINSON:  No, Your Honor.

13      THE COURT:  All right.  Counsel, thank you for your

14  efforts on behalf of your clients in this case.

15      Thank you, Miss Thomas, Mr. Keech, Mr. Weisberg.

16      The Court will be in recess.

17      (Proceedings concluded 4:17 p.m.,

18      June 9, 2022.)

19                    REPORTER'S CERTIFICATE

20      I, JULIE H. THOMAS, Official Court Reporter for the
   United States District Court for the District of Colorado, a
21  Registered Merit Reporter and Certified Realtime Reporter, do
   hereby certify that I reported by machine shorthand the
22  proceedings contained herein at the time and place
   aforementioned and that the foregoing pages constitute a full,
23  true and correct transcript.
                    Dated this 7th day of February, 2023.
24
                         _____/s/ Julie H. Thomas_____
25                        Official Court Reporter

Julie H. Thomas, RMR, CRR                            (303)335-2111